WO        IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

STORMI R. JACKSON,                    )
                                      )
                    Plaintiff,        )
                                      )
        vs.                           )
                                      )
NANCY A. BERRYHILL, Deputy            )
Commissioner of Social Security for   )
Operations,                           )
                                      )        No. 2:17-cv-2803-HRH
                    Defendant.        )
_____)


<u>O R D E R</u>

    This is an action for judicial review of the denial of disability benefits under Title II

of the Social Security Act, 42 U.S.C. §§ 401-434.  Plaintiff Stormi R. Jackson has timely

filed her opening brief,[1] to which defendant, Nancy A. Berryhill, the Deputy Commissioner

of Social Security for Operations, has responded.[2]  Oral argument was not requested and is

not deemed necessary.

<u>Procedural Background</u>

    On June 18, 2010, plaintiff filed an application for disability benefits under Title II

of the Social Security Act.  Plaintiff alleges that she became disabled on February 16, 2010.

_____

    [1]Docket No. 14.

    [2]Docket No. 15.

-1-

Plaintiff alleges that she is disabled because of chronic pain, back pain, arthritis, depression, anxiety, insomnia, ADD, sciatica, degenerative disc disease, irritable bowel syndrome, bladder incontinence, spinal-foraminal stenosis, disc bulging with annular tears, gastritis, flank and abdominal pain, numbness/weakness in both hands, numbness in feet, memory loss, and dizzy spells. Plaintiff's claim was denied initially and on reconsideration. Plaintiff requested an administrative hearing, which was held on December 1, 2011. On December 20, 2011, the ALJ denied plaintiff's claim. Plaintiff sought review by the Appeals Council. On July 2, 2013, the Appeals Council sent plaintiff's claim back to the ALJ to reconsider plaintiff's RFC. Upon remand from the Appeals Council, the ALJ held an administrative hearing on February 25, 2014. A supplemental hearing was held on August 6, 2014. On October 8, 2014, the ALJ again denied plaintiff's claim. Plaintiff sought review by the Appeals Council. On May 1, 2015, the Appeals Council remanded plaintiff's claim to a different ALJ to once again reconsider plaintiff's RFC. After an administrative hearing on January 20, 2016, the ALJ again denied plaintiff's claim. On June 27, 2017, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's March 1, 2016 decision the final decision of defendant. On August 20, 2017, plaintiff commenced this action in which she asks the court to find that she is entitled to disability benefits.

## General Background

Plaintiff was born on May 5, 1973. Plaintiff was 44 years old at the time of the January 20, 2016 hearing. Plaintiff has a GED. Plaintiff lives with her mother. She has

three children, all of whom are now adults. Plaintiff's past relevant work includes work as a medical assistant and a receptionist.

The ALJ's March 1, 2016 Decision

The ALJ first determined that plaintiff "last met the insured status requirements of the Social Security Act on September 30, 2015."[3]

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[4]

---

[3]Admin. Rec. at 32.

[4]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit ... her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

At step one, the ALJ found that plaintiff had "not engage[d] in substantial gainful activity during the period from her alleged onset date of February 16, 2010 through her date last insured of September 30, 2015. . . ."[5]

At step two, the ALJ found that "[t]hrough the date last insured, the claimant had the following severe impairments: status post lumbar fusion; sacroilitis; lumbago; degenerative changes of the cervical spine; unspecified myalgia/myositis; history of attention deficit disorder; major depressive disorder; generalized anxiety disorder; and somatoform disorder. . . ."[6]

At step three, the ALJ found that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. . . ."[7] The ALJ considered Listing 1.04 (disorders of the spine), Listing 12.02 (neurocognitive disorders), Listing 12.04 (depressive, bipolar and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders), and Listing 12.07 (somatic symptom and related disorders).[8] The ALJ considered the "paragraph B" criteria and found that plaintiff had mild limitation of activities of daily living, moderate limitations in social functioning; moderate

---

[5]Admin. Rec. at 33.

[6]Admin. Rec. at 33.

[7]Admin. Rec. at 34.

[8]Admin. Rec. at 34.

difficulties with regard to concentration, persistence, or pace; and no episodes of decompensation.[9]  The ALJ also found that the "paragraph C" criteria for Listings 12.02, 12.04, and 12.06 had not been met.[10]  As part of his step three findings, the ALJ found that "fibromyalgia is not a medically determinable impairment" in this case "because neither of the two sets of criteria for diagnosing fibromyalgia described in sections II.A and II.B of SSR 12-2p is met."[11]

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC."  Bray v. Comm'r of Social Security Admin., 554 F.3d 1219, 1222–23 (9th Cir. 2009).  The ALJ found

> that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(c).  Specifically, the claimant can lift and carry 20 pounds, occasionally and ten pounds, frequently; stand or walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; occasionally climb stairs and ramps, but never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch, and crawl; and occasionally reach overhead bilaterally.  The claimant should avoid even moderate exposure to extreme cold, unprotected heights, and moving and dangerous machinery.  The claimant is able to understand, remember and carryout simple instructions and non-detailed tasks.  The claimant is precluded from work in a setting that includes constant/regular contact with the general public or more than

---

[9]Admin. Rec. at 34-35.

[10]Admin. Rec. at 35.

[11]Admin. Rec. at 36.

infrequent handling of customer complaints.[12]

The ALJ found plaintiff's pain and symptom statements less than credible because they were inconsistent with her activities of daily living, because they were inconsistent with the objective medical evidence, because she received unemployment benefits during the relevant time, because her back condition was "generally stable through 2013[,]" because the treatment for her back pain was "generally conservative and non-aggressive through August of 2014[,]" and because plaintiff's back pain improved with treatment.[13]

The ALJ gave significant weight[14] to the opinions of Dr. Dickstein and Dr. Dodson.[15] The ALJ gave little weight to Dr. Vogt's opinions.[16] The ALJ gave little weight to PA

_____

[12]Admin. Rec. at 36-37.

[13]Admin. Rec. at 38-41.

[14]Admin. Rec. at 41.

[15]On July 29, 2010, Dr. Stephen Dickstein opined that plaintiff could occasionally lift/carry 20 pounds; could frequently lift/carry 10 pounds; could stand/walk for 6 hours; could sit for 6 hours; was unlimited as to pushing/pulling; could frequently climb ramps/stairs; could occasionally climb ladders/ropes/scaffolds; could frequently balance and stoop; could occasionally kneel, crouch, and crawl; and should avoid even moderate exposure to extreme cold and hazards. Admin. Rec. at 149-150. On March 10, 2011, Jerry L. Dodson, M.D., opined that plaintiff could occasionally lift/carry 20 pounds; could frequently lift/carry 10 pounds; could stand/walk for 6 hours; could sit for 6 hours; was unlimited as to pushing/pulling; could frequently climb ramps/stairs; could occasionally climb ladders/ropes/scaffolds; could frequently balance and stoop; could occasionally kneel, crouch, and crawl; and should avoid even moderate exposure to extreme cold and hazards. Admin. Rec. at 168-169.

[16]Admin. Rec. at 42; 44. Dr. Vogt's opinions are discussed below in more detail.

-6-

Smith's opinion.[17]  The ALJ rejected[18] the opinions of Dr. Thompson.[19]  The ALJ gave

significant weight to Dr. Dalton's opinion.[20]  The ALJ also gave significant weight[21] to the

opinions of Dr. Penner[22] and Dr. Garland.[23]  The ALJ gave little weight to the opinions of Dr.

Huddleston and Dr. Novie.[24]  The ALJ considered the lay testimony of Kayli Carrillo, Joy

---

[17]Admin. Rec. at 42.  PA Smith's opinion is discussed below in detail.

[18]Admin. Rec. at 42.

[19]Dr. Thompson was plaintiff's primary care physician from December 3, 2008 through June 21, 2011.  On June 16, 2010, Dr. Thompson opined that plaintiff could not "hold down any regular work of any kind."  Admin. Rec. at 760.  On September 29, 2010, he opined that "[s]he has the inability to hold down any part time or full time [work] due to her multiple medical problems."  Admin. Rec. at 1035.  On January 18, 2011, he opined that plaintiff was "totally disabled. . . ."  Admin. Rec. at 985.  On January 30, 2012, he opined "that during the time that she was under my care she was deemed disabled due to her uncontrolled fibromyalgia condition."  Admin. Rec. at 1172.

[20]Admin. Rec. at 44.  Dr. Dalton's opinion is discussed below in detail.

[21]Admin. Rec. at 44.

[22]Dr. Penner's opinion is discussed below in detail.

[23]On August 23, 2010, Dr. Garland opined that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting.  Admin. Rec. at 151-152.

[24]Admin. Rec. at 45-45.  On March 31, 2011, Gregory Novie, Ph.D., opined that plaintiff's ability for sustained concentration and persistence was "very limited", that her social interaction was restricted, and that she was capable of independent actions.  Admin.
(continued...)

Judd, Gary Enmon, and Steven Lemley but did not give significant weight to any of this testimony.[25]

At step four, the ALJ found that "[t]hrough the date last insured, the claimant was unable to perform any past relevant work. . . ."[26]

At step five, the ALJ found that "[t]hrough the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. . . ."[27] These jobs included housekeeping cleaner, merchandise marker, and routing clerk.[28]

Thus, the ALJ concluded that plaintiff "was not under a disability, as defined in the Social Security Act, at any time from February 16, 2010, the alleged onset date, through

---

[24](...continued)
Rec. at 1083. James E. Huddleston, Ph.D., examined plaintiff on March 9, 2014. Dr. Huddleston opined that plaintiff had no limitations in her abilities to understand, remember, and carry out simple instructions; make judgments on simple work-related decisions; and interact with the public, her supervisor, and co-workers; moderate limitation in her ability to respond appropriately to usual work situations and changes in her routine; marked limitation in her ability to understand and remember complex instructions; and extreme limitation in her abilities to carry out complex instructions and make judgments on complex work-related decisions. Admin. Rec. at 1339-1340.

[25]Admin. Rec. at 45. This testimony is discussed in more detail below.

[26]Admin. Rec. at 45.

[27]Admin. Rec. at 46-47.

[28]Admin. Rec. at 47.

September 30, 2015, the date last insured. . . ."[29]

## Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner. . . ." The court "properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Id. (quoting Andrews, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. Id. But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)).

## Discussion

Plaintiff first argues that the ALJ erred in rejecting Dr. Vogt's opinion. Dr. Vogt was

---

[29]Admin. Rec. at 48.

one of plaintiff's primary care physicians. On January 14, 2014, Dr. Vogt opined that plaintiff could sit for 2 hours, stand for 2 hours, and walk for 2 hours; could frequently lift/carry up to 5 pounds; could use her upper extremities for simple grasping but no pushing/pulling; could not use her feet for repetitive movements; could occasionally bend; could not squat, crawl, climb or reach; could not be around unprotected heights and moving machinery; could not be exposed to marked changes in temperature, humidity, dust, fumes, or gases; and could not drive automotive equipment.[30] Dr. Vogt also opined that plaintiff had severe pain and fatigue which would likely cause interruption of her daily or work routine resulting in her being off task more than 50% of the time.[31]

Dr. Vogt was a treating physician. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "[I]f the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)). Dr. Vogt's opinion was contradicted by the opinions of Dr. Dickstein and Dr. Dodson. Thus, the ALJ was required to give specific and legitimate reasons for rejecting his opinion.

---

[30]Admin. Rec. at 1330. Dr. Vogt also offered an opinion as to plaintiff's mental functioning but plaintiff only challenges the rejection of Dr. Vogt's opinion as to her physical limitations.

[31]Admin. Rec. at 1331.

The ALJ rejected Dr. Vogt's opinion because it was "brief, conclusory, and inadequately supported by clinical findings[;]" because it was "inconsistent with the objective medical evidence as a whole[;]" and because it was "inconsistent with the claimant's admitted activities of daily living. . . ."[32]  Plaintiff argues that these were not legitimate reasons.  As for Dr. Vogt's opinion being brief and conclusory, this was apparently based on the fact that Dr. Vogt used a check-the-box form to express his opinion.  This was not a legitimate reason.  As the Ninth Circuit has observed, "there is no authority that a 'check-the-box' form is any less reliable than any other type of form; indeed, agency physicians routinely use these types of forms to assess the intensity, persistence, or limiting effects of impairments."  Trevizo v. Berryhill, 871 F.3d 664, 677-78 n.4 (9th Cir. 2017).

The second reason the ALJ gave was that Dr. Vogt's opinion was not supported by clinical findings.  Although each of Dr. Vogt's physical exams of plaintiff was unremarkable,[33] there are other clinical findings in the record that support his opinion.  Dr. Narwani managed plaintiff's pain, and his treatment notes, which are extensive, show that he regularly found that plaintiff had pain throughout her spine with limited range of motion, spasms, positive straight leg raising tests, and palpable trigger points throughout her spine.[34]

---

[32]Admin. Rec. at 42.

[33]Admin. Rec. at 1211, 1218, 1362, 1360.

[34]Admin. Rec. at 1050-1051, 1121, 1125, 1131, 1145, 1149, 1154, 1185, 1247, 1252, 1260-1261, 1265, 1267, 1270, 1273, 1276, 1283, 1290, 1292, 1297, 1304, 1318-1319, 1399, 1405, 1411, 1462-1463, 1472-1473, 1477-1478, 1614, 1624, 1626, 1641, 1651-1652, 1657, (continued...)

The second reason given by the ALJ for rejecting Dr. Vogt's opinion was not legitimate.

The third reason given by the ALJ was that Dr. Vogt's opinion was inconsistent with the objective medical evidence as a whole, "which shows that the claimant's pain was adequately controlled with pain management."[35] This was not a legitimate reason as evidenced by Dr. Narwani's October 31, 2013 summary, in which he stated that

> [o]ver the course of the last three years, [plaintiff] has had multiple interventional therapies including injection therapy such as lumbar epidural steroid injections, lumbar radio-frequency rhizotomies, thoracic epidural steroid injections, and lumbar facet joint injections. Although she did receive some short-term symptomatic relief with these procedures, <u>unfortunately the relief is not long lasting</u>. She continues to require opiate pain medications on a regular basis to remain somewhat functional, and to continue with her activities of daily living for which she still needs help from her family. Also, I have tried several different types of medications, which she has either failed due to side-effects, ineffectiveness, or not insurance-covered.[36]

The fourth reason given by the ALJ was that Dr. Vogt's opinion was inconsistent with plaintiff's reported daily activities. In rejecting a treating physician's opinion, the ALJ is required to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" <u>Trevizo</u>, 871 F.3d at 675 (quoting <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)). The ALJ's only

___

[34](...continued)
1662-1663, 1667, 1672-1673.

[35]Admin. Rec. at 42.

[36]Admin. Rec. at 1250 (emphasis added).

discussion of plaintiff's daily activities was at step three. There, the ALJ noted that "[e]xamination notes indicated that the claimant was independent in . . . her personal hygiene tasks[,]" that "claimant was able to do light housekeeping and clean up after herself[,]" and that "the claimant was able to maintain her medical appointments with pain management and physical therapy on a consistent basis."[37] Although this is hardly a detailed and thorough summary of the facts, it is also not inconsistent with Dr. Vogt's opinion. The ALJ described limited daily activities, activities that a person with the limitations opined by Dr. Vogt could reasonably do. The fourth reason given by the ALJ for rejecting Dr. Vogt's opinion was not legitimate.

In sum, the ALJ erred in giving Dr. Vogt's opinion little weight. None of the reasons the ALJ gave for rejecting Dr. Vogt's opinion were legitimate.

Plaintiff next argues that the ALJ erred as to PA Smith's opinion. On November 28, 2011, PA Smith opined that plaintiff could sit for 2 hours; could stand for 2 hours; could walk for 2 hours; could frequently lift/carry up to 5 pounds; had no limits as to simple grasping but could not push/pull or do fine manipulation; could not use her feet for repetitive movements; could occasionally bend; could not squat, crawl, climb, or reach; could not be around unprotected heights and moving machinery; could not be exposed to marked changes in temperature, humidity, dust, fumes, and gases; and could not drive automotive

---

[37]Admin. Rec. at 34.

equipment.[38]  PA Smith also opined that plaintiff had severe fatigue that would "likely cause interruption of daily or work routine resulting in being off task more than 50% of the time."[39]

 "For claims filed before March 27, 2017, physician assistants are not entitled to the same deference as acceptable medical sources." <u>Sesco v. Comm'r of Social Security Admin.</u>, Case No. CIV-16-03391-PHX-MHB, 2018 WL 1324824, at *2 (D. Ariz. March 15, 2018) (citing 20 C.F.R. § 404.1527(f)).  Physician assistants are considered "other sources" and "[t]he ALJ may discount testimony from . . . other sources if the ALJ gives germane reasons as to each source." <u>Id.</u>

The ALJ rejected PA Smith's opinion for the same reasons the ALJ rejected Dr. Vogt's opinion.[40]  As discussed above, none of the reasons the ALJ gave for rejecting Dr. Vogt's opinion were legitimate.  Thus, the ALJ also erred to  PA Smith's opinion.

Plaintiff next argues that the ALJ erred as to the opinions of Drs. Dalton and Penner. The ALJ gave significant weight to the opinions of Dr. Dalton and Dr. Penner.[41]  Dr. Dalton, who was an examining source, opined that plaintiff was "likely to have mild to moderate difficulties sustaining concentration, performing activities within a schedule and completing

---

[38]Admin. Rec. at 1177-1178.

[39]Admin. Rec. at 1178.

[40]Admin. Rec. at 42.

[41]Admin. Rec. at 44.

a normal workday at a consistent pace."[42]  Dr. Penner, a non-examining source, opined that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.[43]

Plaintiff argues that the ALJ's RFC failed to include any limitations related to sustaining concentration, performing activities within a schedule, performing at a consistent pace, or completing a normal workweek or workday.  All the ALJ included in his RFC was that plaintiff "is able to understand, remember, and carryout simple instructions and non-detailed tasks."[44]  Plaintiff argues that this limitation does not address the limitations as to concentration and pace found by Dr. Dalton and Dr. Penner.  Because the ALJ accepted that she had moderate difficulties with maintaining concentration, persistence, or pace, plaintiff argues that the ALJ had to include such limitations in her RFC.  Plaintiff argues that limiting her to simple work or simple tasks was not sufficient.

The ALJ did not err as to the opinions of Drs. Dalton and Penner.  This case is analogous to Stubbs-Danielson v. Astrue, 539 F.3d 1169 (9th Cir. 2008).  In Stubbs-

---

[42]Admin. Rec. at 960.

[43]Admin. Rec. at 170-171.

[44]Admin. Rec. at 37.

Danielson, Dr. McCollum, an examining source, had found that Stubbs-Danielson had "good persistence, but a slow pace in thought and action" and he "observed that Stubbs–Danielson could follow three-step instructions." Id. at 1171. Dr. Eather, a non-examining source, noted Dr. McCollum's observation about Stubbs-Danielson's slow pace and opined that she "could perform simple work without public contact." Id. The "ALJ determined that Stubbs–Danielson 'retain[ed] the residual functional capacity to perform simple, routine, repetitive sedentary work, requiring no interaction with the public.'" Id. "Stubbs–Danielson argue[d that] the RFC finding d[id] not capture the deficiency in pace and other mental limitations identified by" Dr. McCollum and Dr. Eather. Id. at 1173. The court rejected this argument. Id. The court explained that while Dr. McCollum had found that Stubbs-Danielson had moderate limitations in terms of pace, he

> did not assess whether Stubbs–Danielson could perform unskilled work on a sustained basis. Dr. Eather's report did. Dr. Eather's report, which also identified "a slow pace, both in thinking & actions" and several moderate limitations in other mental areas, ultimately concluded Stubbs–Danielson retained the ability to "carry out simple tasks as evidenced by her ability to do housework, shopping, work on hobbies, cooking and reading."

Id. The court concluded that "[t]he ALJ translated Stubbs–Danielson's condition, including the pace and mental limitations, into the only concrete restrictions available to him—Dr. Eather's recommended restriction to 'simple tasks.'" Id. at 1174.

Similarly here, Dr. Dalton found that plaintiff had moderate limitations as to concentration and pace. But, Dr. Dalton did not translate these limitations into concrete work

restrictions. Dr. Penner, who relied on Dr. Dalton's examination of plaintiff,[45] also found that plaintiff was moderately limited as to concentration and pace but ultimately concluded that plaintiff was "able to meet the basic mental demands of unskilled work in a low social context. . . ."[46] The ALJ translated plaintiff's limitations as to concentration and pace into the only concrete limitations available to him, Dr. Penner's recommended restriction to unskilled work in a low social context.

Plaintiff next argues that the ALJ erred as to the lay testimony of Gary Enmon, Kayli Carrillo, Steven Lemley, and Jory Judd. On July 14, 2010, Gary Enmon, plaintiff's friend, reported that plaintiff needed assistance dressing, doing her hair, and using the toilet,[47] that sometimes she needed reminders to shower and wash up,[48] and that she could make simple meals and do some laundry, cleaning, and yard work.[49] Enmon reported that plaintiff has problems getting along with people because she lacks patience "and gets frustrated with anxiety attacks."[50] Enmon reported that any physical activity plaintiff does is "short-lived,"[51] that she has trouble finishing what she starts, needs help with written instructions, and tends

---

[45]Admin. Rec. at 171-172.

[46]Admin. Rec. at 172.

[47]Admin. Rec. at 570.

[48]Admin. Rec. at 571.

[49]Admin. Rec. at 571.

[50]Admin. Rec. at 574.

[51]Admin. Rec. at 574.

to forget spoken instructions.[52]  On June 12, 2010, Enmon reported that plaintiff's "back

cause[s] her pain all the time[.]  She can not move for hours at a time daily.  She has neck

pain on a daily basis.  She has loss of strength in hands and arm numbness regularly.  Pain[]

shoots from her buttocks to her leg daily[.]"[53]  On March 25, 2012, Enmon wrote that

plaintiff

> came to stay with me and my mother in Alaska due to her
> medical conditions. . . .   While she was here she was sleeping
> 14 hours plus per day.  My mother would cook her meals daily
> as it is very painful for her to do herself.  When I would come
> home from work I would help her shower for this is also very
> difficult for her. . . .   I witnessed her in much pain day and
> night.  Her medications don't even help her.  I would have to
> force her to get up and go outside and get some fresh air with
> minimal exercise[.[54]]

On September 1, 2013, Kayli Carrillo, plaintiff's oldest child, wrote that

> [t]here are many times I need to bring my mom down to stay
> with me and my family when there is no one else around that
> can help her because she cannot take care of herself or her own
> needs.  She is not able to stand long enough to cook a meal,
> shop for food, bathing is difficult.  There are many days she
> cannot even get out of bed or turn over without assistance.  I'll
> try to get her out to get fresh air and some exercise.  When she
> does get out it usually ends up making [our] trip or activity . . .
> short for my mother can only be out for a very short period of

---

[52]Admin. Rec. at 574.

[53]Admin. Rec. at 577.

[54]Admin. Rec. at 632.

time before she is in tears from her pain. . . .[55]

On November 12, 2013, Steven Lemley, plaintiff's friend, wrote:

> Ever since I have known [plaintiff] she has had trouble with her back. . . . She is in great pain all the time which is continuing to get worse over all the years I have known her. Stormi was finally diagnosed with fibromyalgia a few years [ago]. When she has fl[ares] of this, which is often[,] it increases her chronic pain severely. . . . Stormi can't enjoy life for [she] is hardly able to leave the house, enjoy her children and grandbaby. She has lost many friends and seems to be in a depressed state most of the time. She is in need of assistance with daily chores, and personal hygiene. . . .[56]

On December 30, 2015, Joy Judd, plaintiff's aunt, wrote that in

> [t]he past 7-8 years I saw an extreme personality change. [Plaintiff] has always been a happy, willing, hard working woman who has been "there" for everyone and all of a sudden, her sunny disposition and logical look on life changed. She can barely walk from one place to the next without extreme pain and a lot of anger in her tone of voice. The personality changes from constant pain, the lack of mobility and inability to do anything without resting a lot has taken its toll on her and everyone else. I see her trying to do things but the tears and pain in her face really hurt to watch.[57]

The ALJ considered this testimony but declined to give any of it significant weight.[58]

"'[I]n order to discount competent lay witness testimony, the ALJ must give reasons that are

---

[55]Admin. Rec. at 630.

[56]Admin. Rec. at 634.

[57]Admin. Rec. at 668.

[58]Admin. Rec. at 45.

germane to each witness.'" <u>Rounds v. Comm'r Social Sec. Admin.</u>, 807 F.3d 996, 1007 (9th Cir. 2015) (quoting <u>Molina v. Astrue</u>, 674 F.3d 1104, 1114 (9th Cir. 2012)).

First, the ALJ discounted the lay testimony because these individuals "are not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms[.]" [59] Defendant concedes that this was not a proper reason.[60]

Second, the ALJ discounted the lay testimony because of the witnesses' "personal relationships as . . . family and friends" of plaintiff.[61] But, an ALJ may not reject lay testimony merely because the witness has a personal relationship with the claimant. <u>Valentine v. Comm'r Social Sec. Admin.</u>, 574 F.3d 685, 694 (9th Cir. 2009).

Third, the ALJ did not give significant weight to this testimony because it was "not consistent with the preponderance of the opinions and observations of the medical doctors in this case."[62] But, an ALJ cannot "discredit . . . lay testimony" because it is "not supported by medical evidence in the record." <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1116 (9th Cir. 2009). "The fact that lay testimony . . . may offer a different perspective than medical records alone is precisely why such evidence is valuable at a hearing." <u>Diedrich v. Berryhill</u>, 874 F.3d 634,

---

[59]Admin. Rec. at 45.

[60]Defendant's Brief at 9, Docket No. 15.

[61]Admin. Rec. at 45.

[62]Admin. Rec. at 45.

640 (9th Cir. 2017).

  In sum, the ALJ erred as to the lay testimony.  None of the reasons the ALJ gave for rejecting this testimony were proper.

  Finally, plaintiff argues that the ALJ erred in finding her pain and symptom statements less than credible.

> Where, as here, an ALJ concludes that a claimant is not malin-
> gering, and that she has provided objective medical evidence of
> an underlying impairment which might reasonably produce the
> pain or other symptoms alleged, the ALJ may "reject the
> claimant's testimony about the severity of her symptoms only by
> offering specific, clear and convincing reasons for doing so."

Brown-Hunter v. Colvin, 806 F.3d 487, 492–93 (9th Cir. 2015) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  "A finding that a claimant's testimony is not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" Id. (quoting Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991)).  "In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'" Molina, 674 F.3d at 1112 (quoting Turner v. Comm'r of Social Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)).  "For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]" Id.  (internal citations omitted).

The ALJ found plaintiff's pain and symptom statements less than credible because they were inconsistent with her activities of daily living, because they were inconsistent with the objective medical evidence, because she received unemployment benefits during the relevant time, because her back condition was "generally stable through 2013[,]" because the treatment for her back pain "was generally conservative and non-aggressive through August of 2014[,]" and because her back pain improved with treatment.[63]  Plaintiff argues that these were not clear and convincing reasons.

As for plaintiff's activities of daily living, the ALJ explained that

> [a]lthough the claimant's activities of daily living were some-
> what limited, some of the physical and mental abilities and
> social interactions required in order to perform those activities
> are the same as those necessary for obtaining and maintaining
> employment and are inconsistent with the presence of an
> incapacitating or debilitating condition.[64]

As set out above, at step three, the ALJ noted that "[e]xamination notes indicated that the claimant was independent in . . . her personal hygiene tasks[,]" that "claimant was able to do light housekeeping and clean up after herself[,]" and that "the claimant was able to maintain her medical appointments with pain management and physical therapy on a consistent basis."[65]  But, this description of plaintiff's daily activities does not show that plaintiff was "'able to spend a <u>substantial</u> part of [her] day engaged in pursuits involving the

---

[63]Admin. Rec. at 38-41.

[64]Admin. Rec. at 38.

[65]Admin. Rec. at 34.

performance of physical functions that are transferable to a work setting[.]" Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quoting Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)). The first reason the ALJ gave for finding plaintiff's pain and symptom statements less than credible was not clear and convincing.

The second reason given by the ALJ was that "the medical evidence pertaining to the claimant's alleged back impairments does not support a finding of disability."[66] Specifically, the ALJ found that "[t]he record reveals that the claimant's allegedly disabling back impairments were present at approximately the same level of severity prior to the alleged onset date."[67] The ALJ explained that the fact that this impairment "did not prevent the claimant from working at that time strongly suggests that it did not prevent the claimant from working at the alleged onset date."[68]

This was not a clear and convincing reason because the record shows that plaintiff's lumbar spine disorder changed from 2009 to 2010. Plaintiff's October 9, 2010 MRI showed that the degenerative disc disease at L5-S1 had increased from the June 15, 2009 MRI.[69] Moreover, the ALJ cited[70] to a February 12, 2010 treatment note from physical therapy in

---

[66]Admin. Rec. at 38.

[67]Admin. Rec. at 38.

[68]Admin. Rec. at 39.

[69]Admin. Rec. at 1013.

[70]Admin. Rec. at 38.

which the therapist noted that plaintiff "demonstrated decreased pain and difficulty with the[] ex today."[71]  This note indicates that plaintiff had less pain and difficulty with her exercises, but it does not say that her back pain had improved as a result of the therapy, as the ALJ seems to imply.  In fact, on March 23, 2010, the physical therapist noted "[o]verall minimal progress with physical therapy program.  [The patient has] reported no significant improvements in pain or function.  She remains weak to core muscles.  Had increased pain [at] some of the therapy sessions with basic ROM and stabilization exercises."[72]

The third reason given by the ALJ was that plaintiff "admitted she received unemployment insurance benefits during the relevant period at issue," which the ALJ explained "required the claimant to certify that she was willing and able to engage in work activity, which is inconsistent with a claim for disability."[73]  This was not a clear and convincing reason.  "[W]hile receipt of unemployment benefits can undermine a claimant's alleged inability to work full-time, the record here[74] does not establish whether [plaintiff] held [her]self out as available for full-time or part-time work.  Only the former is inconsistent with h[er] disability allegations."  Carmickle v. Comm'r, Social Sec. Admin., 533 F.3d 1155, 1161–62 (9th Cir. 2008) (internal citations omitted).

---

[71]Admin. Rec. at 947.

[72]Admin. Rec. at 926.

[73]Admin. Rec. at 39.

[74]Admin. Rec. at 89, 128.

The ALJ also found plaintiff's statements regarding her back pain less than credible because "the objective findings in the record . . . showed [that] the claimant's back condition was generally stable through 2013."[75] The ALJ cited to evidence from April 5, 2010; June 16, 2010; October 9, 2010; January 31, 2011; February 1, 2011;[76] and April 26, 2012.[77] On April 5, 2010, x-rays of plaintiff's thoracic and lumbar spine showed "[m]ild multilevel thoracic spondylosis" and "[m]oderate degenerative disc disease at L5-S1."[78] On June 16, 2010, on exam, plaintiff had "parathoracic and paralumbar spinal tenderness to palpation with restricted range of motion on flexion and extension."[79] On October 9, 2010, plaintiff's MRI of her lumbar spine showed that her "[d]egenerative disc disease is moderate at L5-S1, increased. []L5-S1 small central disc extrusion, new; mild left and mild to moderate right lateral recess stenosis near the S1 nerve roots as well as mild to moderate bilateral foraminal stenosis, unchanged."[80] The MRI of plaintiff's thoracic spine showed:

> 1. Chronic anterior wedging is 10% at T7. Disc degeneration is mild at T6-7. Prevertebral spondylosis is mild to moderate at T5-6. 2. T6-7 moderate disc extrusion to the left with mild to moderate spinal cord flattening without central stenosis. 3. T7-

---

[75]Admin. Rec. at 39.

[76]The ALJ mistakenly refers to this date as February 1, 2012.

[77]Admin. Rec. at 39.

[78]Admin. Rec. at 933.

[79]Admin. Rec. at 760.

[80]Admin. Rec. at 1013.

8 small central disc extrusion with mild spinal cord flattening without central stenosis.  4.  T8-9 small disc extrusion to the right with mild to moderate spinal cord flattening without central stenosis.  5.  Allowing for minor variation in partial volume averaging, no definite interval change is identified since July 15, 2009.[81]

On January 31, 2011, plaintiff's electrodiagnostic study was "normal.  There [was] no electrodiagnostic evidence of a right lumbosacral radiculopathy, plexopathy, polyneuropathy, entrapment neuropathy, or primary muscle disease."[82]  On February 1, 2011, x-rays of plaintiff's thoracic spine were normal;[83] x-rays of her cervical spine showed "no evidence of acute osseous abnormality[;]"[84] and x-rays of her lumbar spine showed "L5-S1 degenerative change."[85]  On April 26, 2012, plaintiff's MRI of her lumbar spine showed:

1.  L5-S1: mild broad-based disc bulge with right subarticular annular tear.  Disc contacts the bilateral traversing S1 nerve roots with mild mass effect upon the right S1 nerve root sheath.  No frank central canal stenosis with mild to moderate right and moderate left foraminal narrowing.  No significant change. 2. Remaining lumbar levels are without focal herniation, central canal stenosis or significant foraminal narrowing.  No significant change.[86]

_____

[81]Admin. Rec. at 1014-1015.

[82]Admin. Rec. at 1055.

[83]Admin. Rec. at 1065.

[84]Admin. Rec. at 1071.

[85]Admin. Rec. at 1072.

[86]Admin. Rec. at 1166.

The MRI of her cervical spine showed "[s]traightening of the cervical lordosis" and "[m]inimal central disc bulges from C3-C4 through C5-C6, without central spinal canal stenosis or neural foraminal narrowing."[87]  The MRI of her thoracic spine showed

> 1. Stable left paracentral disc extrusion at T6-T7, without central spinal canal stenosis or neural foraminal narrowing. 2. Stable central disc protrusion/extrusion at T7-T8, without central spinal canal stenosis or neural foraminal narrowing. 3. Stable right paracentral disc extrusion at T8-T9, without central spinal canal stenosis or neural foraminal narrowing. 4. Small bilateral pleural effusions.[[88]]

Plaintiff emphasizes that this objective evidence shows that she had significant abnormalities with her spine, which may be, but this evidence does suggest that plaintiff's spinal conditions remained stable from 2010 to 2013.  But if plaintiff were disabled as of 2010, whether her spinal condition got worse over the course of the next three years has little to do with whether her statements about her back pain and symptoms were credible.  The fact that plaintiff's spinal condition may have been stable from 2010 to 2013 was not a clear and convincing reason to find her pain and symptoms statements less than credible.

Next, the ALJ found plaintiff's statements about her back pain less than credible because her treatment was "generally conservative and non-aggressive through August of 2014."[89]  The ALJ noted that plaintiff had received numerous epidural injections and opioid

---

[87]Admin. Rec. at 1168.

[88]Admin. Rec. at 1170.

[89]Admin. Rec. at 39.

medication treatment.[90] Such treatment is not conservative. See Garrison v. Colvin, 759 F.3d 995, 1015 n.20 (9th Cir. 2014) ("we doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment"). This was not a clear and convincing reason to find plaintiff's pain and symptom statements less than credible.

Finally, the ALJ found plaintiff's pain and symptom statements less than credible because her back pain improved with treatment. The record, however, shows that Dr. Narwani tried different injections and medications during the relevant time, all with little success and that any improvement plaintiff had after an injection was short-lived. For example, as noted by the ALJ,[91] on January 24, 2012, plaintiff reported that the three cervical epidural steroid injections she had "provided 80% improvement in pain and symptoms and relief persists."[92] But plaintiff also reported that she still had neck pain, that her thoracic pain was a "constant dull ache," that she had constant low back pain, and that her pain that day was 8/10.[93] And on exam, Dr. Narwani found significant limited range of motion in the lumbar back and limited range of motion in her neck; and he performed cervical and lumbar trigger point injections.[94] Thus, this was not a clear and convincing reason to find plaintiff's

---

[90]Admin. Rec. at 40.

[91]Admin. Rec. at 40.

[92]Admin. Rec. at 1147.

[93]Admin. Rec. at 1147.

[94]Admin. Rec. at 1149.

pain and symptom statements less than credible.

In sum, the ALJ erred as to plaintiff's credibility. None of the reasons given by the ALJ were clear and convincing.

Because the ALJ erred as to Dr. Vogt's and PA Smith's opinions, the lay testimony, and plaintiff's credibility, the court must determine whether to remand this matter for further proceedings or an award of benefits. The court follows a three-step analysis to determine whether a remand for an award of benefits would be appropriate. "First, [the court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" Brown-Hunter, 806 F.3d at 495 (quoting Garrison, 759 F.3d at 1020). "Second, [the court] must conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'" Id. (quoting Garrison, 759 F.3d at 1020). "Third, [the court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'" Id. (quoting Garrison, 759 F.3d at 1021). But, "even if all three requirements are met, [the court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" Id. (quoting Garrison, 759 F.3d at 1021).

Because the ALJ erred to Dr. Vogt's and PA Smith's opinions, a remand for benefits is appropriate. Dr. Vogt and PA Smith both opined that plaintiff could walk for 2 hours, sit

for 2 hours, and stand for 2 hours.  Vocational expert Ripp testified that there would be no full-time work for such a person.[95]

As for the ALJ's error as to plaintiff's credibility and the lay testimony, there is no evidence in the record that someone with the limitations described by plaintiff[96] or the lay witnesses would be unable to perform any work.  Generally, that would mean that a remand for further proceedings would be appropriate.  But because the ALJ also erred as to Dr. Vogt's and PA Smith's opinions, and plaintiff would be disabled if their testimony were credited as true, further proceedings are not necessary.  Moreover, the record as a whole here does not create any doubt as to whether plaintiff is in fact disabled.  Rather, "it is clear from the record that [plaintiff] is unable to perform gainful employment in the national economy[.]"  Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004).

Conclusion

The final decision of defendant is reversed and this matter is remanded for an award of benefits.

DATED at Anchorage, Alaska, this 18th day of April, 2018.

/s/ H. Russel Holland<br>United States District Judge

---

[95]Admin. Rec. at 120-121.

[96]See, e.g., Plaintiff's Function Reports, Admin. Rec. 561-568; 591-599.